THE PEQUOT.[1]

THE ALASKA.

BROOKLYN & N. Y. FERRY CO. *v.* THE PEQUOT.

PROVIDENCE & STONINGTON S. S. CO. *v.* THE ALASKA.

(*District Court, E. D. New York.* April 4, 1887.)

1. COLLISION—STEAMER AND FERRY-BOAT—EAST RIVER NAVIGATION—KEEPING IN MID-STREAM—ARTICLE 16, INTERNATIONAL REGULATIONS.

The steamer P. was coming down the East river, near the New York shore, on the ebb-tide, when the ferry-boat A. started out from the New York shore

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

to cross to Brooklyn. The P. thereupon blew two whistles, and sheered to port, to cross the bows of the A., relying, as she did so, upon the A.'s stopping. The ferry-boat, being upon the starboard hand of the P., did not stop, with the result that she was run into by the steamer. *Held,* that a fault in the P. was in her not keeping in the middle of the river; that, the situation being governed by article 16 of the International Regulations, it was the duty of the A. to keep her course, and of the P. to avoid her; that the latter was therefore solely liable for the collision.

2. SAME—CUSTOM—SOUND STEAMERS—EXEMPTION FROM ARTICLE 16.
    If there is a custom which permits Sound steamers to claim exemption from the operation of article 16 of the International Regulations, when approaching the ferries in the East river on the ebb-tide, such custom is opposed to law, and cannot prevail.

In Admiralty.
*Wilcox, Adams & Macklin,* for the Alaska.
*Miller, Peckham & Dixon,* for the Pequot.

BENEDICT, J. I do not see any way to avoid the conclusion that the Pequot was in fault for not keeping a course in the middle of the river. Her excuse for running along the New York piers is that she was prevented from going in the middle of the river by the presence of other vessels in the river. Other vessels were in the river, but I see no reason to doubt that she could, notwithstanding, have been much nearer to the middle of the river than she was when she reached pier 36. Her witnesses declare that the other vessels prevented any attempt on her part to get out into the river until they reached between piers 36 and 37, and it is argued that this should be believed, because, aside from any desire to comply with the law, which should be presumed, it was for her interest to come down in the middle of the river as her shortest course. I do not understand such to be the fact. So far as distance is concerned, I suppose the Pequot saved distance by the course she took. Consequently she was under temptation to find, in the presence of other vessels, an excuse for keeping near the New York piers, and to magnify the difficulties of reaching the middle of the river, when the result of such a course proved disastrous. But it is to be observed that her master, in command at the wheel, called on to assign a reason for not keeping out towards the middle of the river when signaled so to do by the Peconic, does not allude to the presence of other vessels as an obstacle to such a course. The only reason he gives is that he was then headed for New York, and could not break his sheer. If such was his course at that point, he was clearly in fault.

But, whatever difficulty the Pequot might have encountered in an attempt to reach the middle of the river while keeping her headway, it is certain that by stopping, as she could even on the ebb-tide, until the vessels approaching from below had passed, she could have gained her proper position in the river long before she reached pier 36. Had she done this, she would not have collided with the ferry-boat Alaska as she did. She must therefore be adjudged guilty of a fault contributing to the collision.

The real controversy, as I view the case, is in regard to the action of

the ferry-boat Alaska. The claim of the Pequot is that the ferry-boat should have stopped as the Pequot approached from above. The relative positions and courses of the Pequot, and the Alaska are not left in doubt. The Alaska started upon her course, and began to move out of her New York slip, on her regular trip, when the Pequot was passing down outside the ferry-boat Peconic, then just above pier 36, and bound up the river. The courses of the Pequot and the Alaska from that time were crossing, and the Alaska was upon the Pequot's starboard side. The case, then, was governed by article 16 of the International Regulations. It was therefore the duty of the Pequot to avoid the Alaska, and the duty of the Alaska to keep her course.

What happened was this: After the Pequot saw the Alaska to be moving out, she blew two whistles, and sheered to port, intending to cross the Alaska's bows; and, as the testimony of the master of the Pequot clearly shows, she relied upon the Alaska's stopping to enable the Pequot to pass ahead of the Alaska in safety. The Alaska did not stop, and the Pequot, when some 400 feet out in the river, brought up on the Alaska's port side abaft the beam with a powerful blow.

I do not see in this any fault on the part of the ferry-boat. It is insisted that the situation relieved the vessels from the operation of article 16, and entitled the Pequot to require the ferry-boat to stop. But I am unable to see why. Of course, it was not easy for a vessel loaded as the Pequot, and in the ebb-tide, to make sudden changes of course, and the fact emphasizes the fault of the Pequot in sheering to port as she did, with the ferry-boat in sight and moving out. But there is nothing in such a fact to excuse the Pequot from complying with article 16, or to justify her in supposing that the ferry-boat would not expect such compliance from her. The ferry-boat, indeed, knew that the Pequot was not in the middle of the river, but she would not know when the Pequot would attempt to gain the middle of the river; neither could she know the Pequot's sheer was made for the purpose of gaining the middle of the river, nor could she know that it was impossible for the Pequot to break her sheer after it had once been taken. What the ferry-boat did know was that the Pequot could avoid her by passing between her and the New York shore, where, as was obvious at the time and as the result proved, the Pequot would find abundant room. The ferry-boat knew, therefore, that no departure from the rule of article 16 was necessary to avoid immediate danger, and accordingly she had the right to presume obedience to article 16 by the Pequot, and to keep her own course, leaving the Pequot to keep out of her way, as required by article 16.

If, as claimed here, but also denied, custom permits Sound steamers to claim exemption from article 16, when approaching the ferries in the East river on the ebb-tide, such custom, opposed as it is to law, cannot avail. Nor should it avail; for, as long ago declared by Judge BETTS, (*The Relief*, Olcott, 104,) and as since frequently affirmed, the regular way of the ferry-boats is not to be impeded by vessels approaching their track. No doubt, it is important for the Sound boats to make their time;

but it is more important for the ferry-boats in the East river to make their time, and most important for both that no private understanding of their relative importance be allowed to create exceptions as to the rules of navigation established by law.

My conclusion, therefore, is that the collision in question was caused solely by the fault of the Pequot. The libel of the Providence & Stonington Steam-Ship Company against the Alaska is therefore dismissed, with costs, and in the action of the Brooklyn & New York Ferry Company against the Pequot there must be a decree for the libelant, with a reference to ascertain the amount of the damages.